**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FORT SMITH DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** <br> **Plaintiff** <br><br> **v.** <br><br> **CLARENCE C. GARRETSON,** <br> **Defendant** | )<br>)<br>)<br>)<br>)<br>)<br>) | **Case No. 2:16-CR-20029-001** |

**MOTION FOR COMPASSIONATE RELEASE PURSUANT TO SECTION 603 OF THE FIRST STEP ACT OF 2018 AND 18 U.S.C. § 3582(c)(1)(A)(i)**

COMES NOW the Movant, Clarence C. Garretson, requesting the reduction of his sentence pursuant to Section 603 of the First Step Act of 2018, enacted December 21, 2018, regarding eligible elderly and terminally ill offenders, and pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) based on the "extraordinary and compelling reasons" presented by his vulnerability to COVID-19. Mr. Garretson has chronic obstructive pulmonary disease ("COPD"), asthma, high cholesterol, and is prediabetic, which places him at serious risk of becoming severely ill from infection with COVID-19. He submits that his serious health conditions and the unprecedented risk posed by the global COVID-19 pandemic satisfy the "extraordinary and compelling reasons" under § 3582(c)(1)(A)(i). Furthermore, Mr. Garretson is designated to Tucson USP where a total of 101 inmates and 16 Bureau of Prison ("BOP") staff members have tested positive for COVID-19, while the BOP as a whole has had 17,460 inmates and 2,218 staff test positive, with 129 inmate and 2 staff deaths.[1] Mr. Garretson is elderly and medically vulnerable to COVID-19, and he requests that this Court issue an order reducing his sentence to time served, after which he will spend a lengthy period on home confinement as a

[1] Fed. Bur. of Prisons, COVID-19 Tested Positive Cases, available at https://www.bop.gov/coronavirus/ (includes recovered cases).

condition of supervised release.

## PROCEDURAL HISTORY

On May 31, 2017, Mr. Garretson was sentenced to life in prison for five counts of interstate transportation of a minor with intent to engage in criminal sexual activity in violation of 18 U.S.C. § 2423(a).[2] (Doc. 55). Mr. Garretson has been incarcerated since June 25, 2016, and is currently incarcerated at USP Tucson in Tucson, Arizona. He is 69 years old and has COPD, asthma, hyperlipidemia, and is prediabetic. *See* Mr. Garretson's Medical Records at Exhibit "A", p. 1-2, 4, 12 and Exhibit "B." Mr. Garretson asserts that the conditions inside the prison do not allow the proper social distancing that he could maintain if he were confined to the home with his wife, Lisa Garretson, in Van Buren, Arkansas. Because of Mr. Garretson's age and compromised health, he is at a high risk for serious illness or death should he succumb to COVID-19.[3]

On August 1, 2020, Mr. Garretson filed a request for reduction in sentence with the warden of Tucson USP. *See* Exhibit "C," pp. 1-3. The warden denied this request on August 5, 2020. *Id.* at 4. Mr. Garretson then appealed the warden's denial to the regional director on September 28, 2020. *Id.* at 5. More than 30 days have passed without a response. He submits that he has exhausted his administrative remedies. On June 2, 2020, this Court appointed the Federal Defender's Office with respect to filing a Motion for Compassionate Release pursuant to section 603 of the First Step Act of 2018. (Doc. 96). Through counsel, Mr. Garretson now files his Motion.

## LAW AND ANALYSIS

On December 21, 2018, the President signed the First Step Act of 2018 (FSA), Pub. L. No.

---

[2] The judgment ordered Mr. Garretson to serve 15-year sentences for counts two, four, eight, and eleven for interstate transportation of a minor to engage in criminal sexual activity, which would be served concurrently to his life sentence on count one.

[3] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html

115-391, 132 Stat. 5194. The FSA amended certain portions of the U.S. Code including 18 U.S.C. § 3582(c)(1)(A) to allow a defendant, for the first time, to petition a district court directly to reduce a sentence. The district court has jurisdiction to consider a defendant's motion for sentence reduction "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier . . . ." 18 U.S.C. § 3582(c)(1)(A). Mr. Garretson submitted the appeal of the warden's denial of his request for compassionate release to the BOP's regional director on September 28, 2020, and there has been no response. Therefore, the FSA shifts the authority to this Court to decide Mr. Garretson's request for compassionate release and determine if his serious health conditions, the COVID-19 pandemic, and the Eighth Amendment present "extraordinary and compelling" circumstances warranting a sentence reduction to time served.

### A. Authority to Reduce a Sentence Pursuant to 18 U.S.C. §3582(c)(1)(A)(i).

Pursuant to the FSA, this Court can grant Mr. Garretson's request for a sentence reduction "if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . .[,] and that such a reduction is consistent with applicable policy statements issued by the [United States] Sentencing Commission[.]" 18 U.S.C. §3582(c)(1)(A)(i). Congress first enacted 18 U.S.C. § 3582(c)(1) as part of the Comprehensive Crime Control Act of 1984 to serve as a "safety valve" for judges to assess whether a sentence reduction was warranted by factors that previously would have been addressed through the abolished parole system. S. Rep. No. 98-225, at 121 (1983). "This legislative history demonstrates that Congress . . . intended to give district courts an equitable power to employ on an individualized basis to correct sentences when 'extraordinary and compelling reasons' indicate that the sentence initially imposed on an individual no longer served legislative

objectives." *United States v. Millan*, No. 91-CR-685 (LAP), 2020 WL 1674058, at * 5 (S.D.N.Y. Apr. 6, 2020).

Congress delegated to the Sentencing Commission the responsibility of defining "extraordinary and compelling reasons," 28 U.S.C. § 994(t), which include medical conditions, age, family circumstances, and "other reasons." U.S.S.G. § 1B1.13, app. n.1(A)-(D). Application Note 1(B) identifies "extraordinary and compelling reasons" to include when "[t]he defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less." Furthermore, Application Note 1(D) created a catch-all provision, for when the Director of the BOP determined "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)."

As originally enacted, the statute left sole discretion for filing compassionate release motions with the Director of the BOP, who adopted a program statement governing compassionate release that in many ways narrowed the criteria established by the Commission. *See* BOP Program Statement 5050.49. During the span of more than three decades, the BOP rarely filed motions on behalf of inmates who met the eligibility criteria. The Office of the Inspector General for the Department of Justice concluded in 2013 that "[t]he BOP does not properly manage the compassionate release program, resulting in inmates who may be eligible candidates for release not being considered." Dep't of Justice, Office of the Inspector General, *The Federal Bureau of Prisons' Compassionate Release Program* (April 2013), at 11, available at https://oig.justice.gov/reports/2013/ e1306.pdf; *see also* Dep't of Justice, Office of the Inspector General, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* (May 2015), at 51, available at https://oig.justice.gov/ reports/2015/e1505.pdf ("Although the BOP has revised its compassionate release policy to expand

consideration for early release to aging inmates, which could help mitigate the effects of a growing aging inmate population, few aging inmates have been released under it.”).

Through the First Step Act, Congress sought to resuscitate compassionate release by, *inter alia*, allowing defendants to directly petition courts for relief, rather than leaving that power solely in the hands of the BOP. *See* 18 U.S.C. § 3582(c)(1)(A). Accordingly, this Court has the authority to consider whether the global COVID-19 pandemic, the spread of COVID-19 in prison, Mr. Garretson’s age, health conditions, and the other relevant circumstances in this case present extraordinary and compelling reasons for a sentence reduction.

## ARGUMENT

Judges around the country have found that a defendant’s vulnerability to COVID-19 constitutes “extraordinary and compelling reasons” for relief. Mr. Garretson’s COPD, asthma, hyperlipidemia, and failing health make him especially vulnerable to COVID-19, constituting “extraordinary and compelling reasons” for relief. Because Mr. Garretson has spent several years behind bars and he is now 69 years old, he submits that with lifetime supervision from the United States Probation Office, his release no longer poses a danger to the community, and a balancing of the 18 U.S.C. § 3553(a) factors with the risks posed by COVID-19 warrants relief.

### A. Mr. Garretson’s Situation Presents an “Extraordinary and Compelling” Reason Warranting a Reduced Sentence.

The global COVID-19 pandemic is a quintessential extraordinary circumstance beyond what Americans have experienced in their lifetimes. The pandemic presents greater risk to certain categories of individuals. The Centers for Disease Control and Prevention (“CDC”) have identified several factors that put individuals at higher risk for severe illness: cancer, chronic kidney disease, COPD, immunocompromised state from solid organ transplant, obesity (body mass index [BMI] of

30 or higher), serious heart conditions, such as heart failure, coronary artery disease, or cardiomyopathies, sickle cell disease, and Type 2 diabetes mellitus. *PEOPLE WITH CERTAIN MEDICAL CONDITIONS, CENTERS FOR DISEASE CONTROL AND PREVENTION*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last accessed October 29, 2020). The CDC also warns that the following conditions *may* increase the risk for severe illness from COVID-19: Asthma (moderate-to-severe), cerebrovascular disease, cystic fibrosis, hypertension or high blood pressure, immunocompromised state from blood or bone marrow transplant, immune deficiencies, HIV, use of corticosteroids, or use of other immune weakening medicines, neurologic conditions (such as dementia), liver disease, pregnancy, pulmonary fibrosis (having damaged or scarred lung tissues), smoking, Thalassemia, and Type 1 diabetes mellitus. *Id.* The CDC advises individuals in those categories to take extra precautions to avoid coming into contact with COVID-19.

The severity of the coronavirus pandemic is reflected in the actions of local and national leaders who have taken drastic measures to prevent the spread of the disease. All 50 states and the national government have declared states of emergency. *See Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak* (Mar. 13, 2020), https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/. Kamran Rahman & Alice Miranda Ollstein, *How States Are Responding to Coronavirus, in 7 Maps*, POLITICO (Mar. 24, 2020), https://www.politico.com/news/2020/03/24/coronavirus-state-response-maps-146144. Although many states imposed severe "lockdown" rules for their citizens, most states have relaxed those measures and reopened many types of businesses while instructing the citizens to wear masks.

However, as of this writing, Arizona's total cases have increased to 241,165 and 5,905 deaths. https://www.worldometers.info/coronavirus/country/us/ (last accessed October 29, 2020).

**B. Prisons Create the Ideal Environment for Transmission of COVID-19.**

As of October 29, 2020, nationwide BOP facilities and residential reentry centers reported a total of 17,460 inmates and 2,218 staff have tested positive for COVID-19, and 129 inmates[4] and 2 staff members have died. https://www.bop.gov/coronavirus. Conditions of imprisonment create the ideal environment for the transmission of contagious diseases. Joseph A. Bick, *Infection Control in Jails and Prisons*, 45 CLINICAL INFECTIOUS DISEASES 1047, 1047 (2007), https://doi.org/10.1086/521910. "Incarcerated/detained persons live, work, eat, study, and recreate within congregate environments, heightening the potential for COVID-19 to spread once introduced." CDC, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html. The CDC recognizes the difficulty of preventing the introduction of COVID-19 into prison facilities:

> There are many opportunities for COVID-19 to be introduced into a correctional or detention facility, including daily staff ingress and egress; transfer of incarcerated/detained persons between facilities and systems, to court appearances, and to outside medical visits; and visits from family, legal representatives, and other community members. Some settings, particularly jails and detention centers, have high turnover, admitting new entrants daily who may have been exposed to COVID-19 in the surrounding community or other regions.

*Id.*

Crowding, inadequate ventilation, and security issues contribute to the spread of infectious disease in jails and prisons. Martin Kaste, *Prisons and Jails Worry About Becoming Coronavirus 'Incubators'*, NPR (Mar. 13, 2020), https://www.npr.org/2020/03/13/ 815002735/prisons-and-jails-

---

[4] Four of the inmate deaths occurred after the inmates were transferred to home confinement.

worry-about-becoming-coronavirus-incubators. Hand sanitizer, a disinfectant recommended by the CDC to reduce transmission rates, is contraband in jails and prisons because of its alcohol content. Keri Blakinger & Beth Schwarzapfel, *How Can Prisons Contain Coronavirus When Purell is a Contraband?*, ABA JOURNAL (Mar. 13, 2020), https://www.abajournal.com/news/article/when-purell-is-contraband-how-can-prisons-contain-coronavirus.

Even the most comprehensive measures taken by prisons have proven insufficient to prevent the spread of COVID-19 into such facilities. A large part of the problem with measures taken by the BOP is the focus upon the screening of detainees and staff for symptoms associated with COVID-19. Such screening is ineffective to prevent the spread of COVID-19 by those individuals who are not yet manifesting symptoms. Because there is a long phase of silent viral shedding by individuals who have not yet developed symptoms of COVID-19, "stealth" transmission by infected persons with minor or no symptoms has been a "major driver" of the progression of the pandemic, and asymptomatic carriers pose incredibly high risks. *See* CDC, *Indirect Virus Transmission in Cluster of COVID-19 Cases, Wenzhou, China, 2020* (Mar. 12, 2020), https://wwwnc.cdc.gov/eid/article/26/6/20-0412_article (last accessed October 29, 2020) (noting that "persons with asymptomatic COVID-19 can spread the virus").

Infectious disease management is seriously difficult in a prison setting. *See* Nicole Wetsman, *Prisons and Jails Are Vulnerable to COVID-19 Outbreaks*, The Verge (Mar. 7, 2020), https://www.theverge.com/2020/3/7/21167807/coronavirus-prison-jail-health-outbreak-covid-19-flu-soap (last accessed October 29, 2020). "Viruses of all kinds have multiple entry points, and those that enter tend to spread fast. Outbreaks of the flu regularly occur in these facilities, and during the H1N1 epidemic in 2009, many jails and prisons dealt with high numbers of cases." *Id.* According to Tyler Winkelman, co-director of the Health, Homelessness, and Criminal Justice Lab at the Hennepin

Healthcare Research Institute in Minneapolis, Minnesota, "We know the coronavirus spreads quickly in closed spaces, like cruise ships, nursing homes—and jails and prisons." *Id.*; *see also Basank v. Decker*, No. 20-cv-2518, 2020 WL 1481503, at *3 (S.D.N.Y. Mar. 26, 2020) ("The nature of detention facilities makes exposure and spread of the virus particularly harmful.").

Although the BOP has put protective measures in place to prevent the spread of COVID-19, the disease continues to spread throughout the BOP prison system at a rapid rate. Workers at the Hazelton facility reported that the United States Marshals are not testing inmates for COVID-19 prior to dispersing them to various BOP facilities. *See* https://www.dominionpost.com/2020/09/01/union-marshals-are-not-following-protocol/ (last viewed October 29, 2020). Indeed, members of the United States Congress have sent a letter to the Director of the Marshals Service addressing this very issue and inquiring into the protocols that have been put in place to protect the spread of COVID-19 to inmates. *See* Letter to Director Washington, Exhibit "D."[5]

Thus, the BOP simply does not have the ability to distance inmates from each other or provide them with the disinfecting tools to prevent the spread. This is why inmates who have served lengthy sentences, are older, have medical conditions, and no longer present a danger to society should be released. Inmates are housed in crowded conditions and share the communal bathrooms, computers, bunks, and that social distancing is nearly impossible.

**C. Mr. Garretson is Especially Vulnerable to COVID-19 and Courts Have Been Responsive in Similar Situations.**

Mr. Garretson is 69 years old and is immunocompromised. He has COPD, asthma, hyperlipidemia, cataracts, and erectile dysfunction. Judges in districts throughout the United States have recognized that, at least for certain defendants, COVID-19 presents "extraordinary and

[5] The undersigned was unable to locate information as to whether the USMS responded to this letter.

compelling reasons" warranting a reduction in sentence under the compassionate release statute. Some courts have granted compassionate release when defendants had medical conditions that included COPD. *See e.g.*, *United States v. Juarez-Parra*, No. CR 11-0125 RB, 2020 WL 5645703, at *5 (D.N.M. Sept. 22, 2020) (granting compassionate release to defendant with type 2 diabetes, COPD, morbid obesity, hypertension, and asthma who had served over 80% of his sentence); *United States v. Swanson*, No. 2:18-CR-00294-BLW, 2020 WL 5549142, at *1 (D. Idaho Sept. 16, 2020) (release granted for defendant with COPD, thickening of the pleura (lung lining), obstructive sleep apnea, among other medical conditions); *United States v. Tippett*, No. 2:14-CR-223-1, 2020 WL 5542141, at *2 (S.D. Ohio Sept. 16, 2020) (granting release to defendant with less than one year left on sentence who had COPD, high blood pressure, diabetes, sleep apnea, and asthma, that placed him at an increased risk of harm from COVID-19); *United States v. Howard*, No. 4:15-cr-00018-BR, 2020 WL 2200855 (E.D.N.C. May 6, 2020) (granting release based on COPD, Type II diabetes, obesity, Stage 3 kidney disease, edema, open wounds on his legs, and a diaphragmatic hernia even though these conditions did not prevent him from engaging in most of his daily activities without assistance); *See United States v. Simon*, No. 18 CR. 390-15 (PAE), 2020 WL 5077390, at *3 (S.D.N.Y. Aug. 27, 2020) (compassionate release granted to a defendant who had HIV, COPD, Hepatitis C, prostate cancer, and hypertension, but required a modified release plan).

Further, hyperlipidemia has been listed as one of the risk factors for complications from COVID-19. *See e.g. United States v. Wilson*, No. 13-CR-2011 CJW-MAR, 2020 WL 5894193, at *4 (N.D. Iowa Oct. 5, 2020) (granting compassionate release for defendant with stage 1 chronic kidney disease, hyperlipidemia, obesity, hypertension, and breathing difficulties); *United States v. Wiley*, No. 4:06CR3145, 2020 WL 5569952, at *5 (D. Neb. Sept. 17, 2020) (compassionate release granted for defendant with hyperlipidemia and coronary artery disease).

Mr. Garretson's risk of severe COVID-19 illness from his advanced age and health conditions constitute "extraordinary and compelling circumstances" for which this Court may reduce his sentence. 18 U.S.C. § 3582(c)(1)(A); U.S.S.G. §§ 1B1.13, cmt. n.1(A)(ii) and/or n.1(D). Medical records report that Mr. Garretson has COPD, asthma, hyperlipidemia, a shoulder injury, and cataracts. *See* Exhibit "A," p. 1, 2, 4, 12; Exhibit "B," p. 1-2, 4, 9. According to his presentence investigation report, he also suffers from erectile dysfunction. PSR, Doc. 38, ¶¶ 238-239; *see also* Exhibit "E," consultation with Dr. Shalhoub. Mr. Garretson takes medication for his illnesses, to include albuterol, atorvastatin, ipratropium, and mometasone furoate for his asthma, COPD, and hyperlipidemia. Exhibit "A," p. 2.

Further, medical treatment or the lack thereof is largely irrelevant to the question presently before this Court. That is, the question is not whether Mr. Garretson's pre-existing medical conditions, standing *alone*, are serious enough to warrant his compassionate release under § 3582(c)(1)(A) and § 1B1.13. The relevant inquiry as to whether his conditions *in combination with* the COVID-19 pandemic constitute "extraordinary and compelling reasons" is – first – whether Mr. Garretson *has* those conditions (he does); and – second – whether those conditions increase his risk of developing severe COVID-19 illness. Chronic lung disease resulted in significant hospitalizations at 19.5 percent, and asthma presents a 10.8 percent hospitalization rate according to the CDC's most recent data for October 17, 2020:




CDC, COVID-NET: *COVID-19 Laboratory-Confirmed Hospitalizations – Preliminary Data as of October 17, 2020: Selected Underlying Medical Conditions*, Available online at: https://gis.cdc.gov/grasp/COVIDNet/COVID19_5.html (last accessed October 29, 2020).

**D. The Relevant § 3553(a) Sentencing Factors Warrant Reducing Mr. Garretson's Sentence to Time Served and Allowing Him to Complete a Period of Time on Home Confinement as a Condition of Supervised Release.**

When extraordinary and compelling reasons are established as set forth herein, the Court must consider the relevant sentencing factors in § 3553(a) to determine whether a sentence reduction is warranted. *See* 18 U.S.C. § 3582(c)(1)(A)(i). Mr. Garretson's offenses were serious and involved the sexual exploitation of minor children. He points out that he has completed his GED, taken coursework and other steps to rehabilitate himself, and that he is elderly and has erectile dysfunction. He also points out that he has not had any disciplinary violations since he has been incarcerated. *See* Exhibit "F." Further, his program review notes that he has "maintained clear conduct and . . . maintains positive interactions with staff and inmates and maintains personal accountability." Exhibit "G." He is also employed as a unit orderly. *Id.* He asks this Court to reduce his sentence to time served, order that he spend a lengthy period of time on home confinement as a condition of supervised release, and grant this Motion.

He is 69 years old, and the Sentencing Commission recognizes that recidivism rates decrease as a person ages.[6] Although Mr. Garretson's offenses of conviction qualified him for the life sentence this Court originally imposed, the sentencing purpose of just punishment does not warrant a sentence that includes exposure to a life-threatening illness. Mr. Garretson asks this Court to consider his age, his numerous illnesses, his model prisoner status, and that a grant of his motion for compassionate release of time served is consistent with the goals of sentencing.

Application Note 1(D) identifies "extraordinary and compelling reasons" to include a catch-all provision for when there exists in the defendant's case an extraordinary and compelling reason for release. Mr. Garretson falls within the catch-all standard as he is elderly and has serious health

---

[6] https://www.ussc.gov/research/research-reports/effects-aging-recidivism-among-federal-offenders

conditions that make him susceptible to illness from COVID-19. These factors, when considering the COVID-19 pandemic, warrant a reduction in his sentence.

Further, "releasing . . . [Mr. Garretson] under these unusual circumstances – . . . [his] health and the COVID-19 pandemic – will not undermine the goal of general deterrence. *See* § 3553(a)(2)(B) . . . .[and] will not subject the public to any risk. . . . *See* § 3553(a)(2)(C)." *United States v. Reddy*, No. 13-cr-20358 (E.D. Mich. May 11, 2020) (ECF No. 185 at 19). Mr. Garretson has completed his GED, worked as an orderly, and followed the instructions of the prison staff. He will be on lifetime supervision when he is released and will be monitored by the Probation Office to assure compliance. In addition, he will not be permitted to have any unsupervised contact with minors. In any event, the overriding factor under § 3553(a) that was not present at the time of sentencing is the COVID-19 pandemic and the serious risk it presents. In fact, the Eighth Amendment's prohibition on cruel and unusual punishment includes unreasonable exposure to dangerous conditions in custody. *Helling v. McKinney*, 509 U.S. 25, 28 (1993); *see also Wallis v. Baldwin*, 70 F.3d 1074, 1076 (9th Cir. 1995) (applying *Helling* to exposure to asbestos); *Brown v. Mitchell*, 327 F. Supp. 2d 615, 650 (E.D. Va. 2004) (applying *Helling* to contagious diseases caused by overcrowding conditions). That prohibition applies equally to the COVID-19 pandemic and the risk it brings to Mr. Garretson.

Mr. Garretson's age and compromised physical health and the unique danger he faces of contracting COVID-19 and becoming severely ill, when combined with the other § 3553(a) sentencing factors, clearly warrant relief. *First*, Mr. Garretson acknowledges that while his crimes were very serious, he has attempted to prove that he is not beyond redemption by taking coursework at the BOP to better himself, obtaining his GED, working as an orderly, and maintaining good conduct. He asks this Court to consider his age and health. Under § 3582, an inmate granted release

must not be "a danger to the safety of any other person or to the community." Mr. Garretson has spent years attempting to rehabilitate himself in prison to prove that he is not a danger to others. His inmate program review reveals that he has worked as an orderly and earned a GED while he was incarcerated. Exhibit "G." The report recognizes that Mr. Garretson has continued to educate himself during the pandemic through taking a small engine repair course so that he can increase his job skills in the event of his release. *Id.*

*Second*, being incarcerated during this outbreak "sufficiently increased the severity of the sentence beyond what was originally anticipated." *United States v. Mel*, No. TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020). *Third*, continued incarceration is not necessary to protect the community from the crimes of Mr. Garretson, as he is now 69 years old and rates of recidivism decrease with age. The BOP has assessed him as a minimum risk when it considered whether he was eligible for the First Step Act. *See* Exhibit "H." In addition, he submits that he has a safe place to live and will reside with his wife, Lisa Garretson, on their acreage in Van Buren. Ms. Garretson is also elderly and needs assistance in the care of the property. He plans to operate an auto and diesel mechanic shop on his property to provide financial support for his wife and him. Due to his age, he will be eligible for social security and veteran's benefits, which will assist him with his financial and medical needs. Moreover, the probation office will supervise and monitor Mr. Garretson for the rest of his life and Mr. Garretson can be placed on home confinement for the length of his supervision if ordered by this Court.

Thus, a reduction of Mr. Garretson's sentence would not place the public in any danger, as Mr. Garretson has had time to reflect on his crimes and will have the family support needed to assist him. Because Mr. Garretson has been incarcerated for over four years, in order to have a sentence which is "sufficient, but not greater than necessary" to satisfy the goals of sentencing under

§ 3553(a), he seeks an order reducing his sentence to time served and ordering him to complete a lengthy period of time on home confinement as a condition of supervised release.

**CONCLUSION**

The COVID-19 pandemic in conjunction with Mr. Garretson's age and serious medical conditions make him vulnerable to severe illness, or even death, should he contract COVID-19, and is an extraordinary and compelling reason to reduce his sentence to time served.

Respectfully Submitted,

BRUCE D. EDDY
FEDERAL PUBLIC DEFENDER
WESTERN DISTRICT OF ARKANSAS

By: /s/ *Anna M. Williams*
Anna M. Williams
Assistant Federal Public Defender
Office of the Federal Public Defender
112 W. Center St., Suite 300
Fayetteville, AR 72701
(479) 442-2306

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the Assistant United States Attorney, and I hereby certify that I have mailed the document by the United States Postal Service to the following non-CM/ECF participants: Clarence C. Garretson.

/s/ *Anna M. Williams*
Anna M. Williams
Assistant Federal Public Defender