UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

UNITED STATES OF AMERICA                                                                          PLAINTIFF

v.                                              No. 2:16-cr-20029

CLARENCE C. GARRETSON                                                                           DEFENDANT

**OPINION AND ORDER**

Before the Court is Defendant Clarence Garretson's motion (Doc. 109) to reduce his sentence pursuant to the First Step Act amendments to 18 U.S.C. § 3582(c). The Government filed a response (Doc. 113) in opposition, to which Mr. Garretson has replied (Doc. 115). Mr. Garretson asks the Court to reduce his sentence to time served so that he can return home to his family. For the reasons stated below, the motion will be DENIED.

**I.      The Offense of Conviction**

*a. Factual History*

Mr. Garretson and his wife, Lisa, served as foster parents for the State of Arkansas. (Doc. 38, pp. 7–8). In 2016, a girl in the Garretsons' care (whom the Court will refer to by the pseudonym "Avery")[1] reported that Mr. Garretson had sexually assaulted her. *Id.* at 8. Avery claimed that Mr. Garretson, an over-the-road trucker, "made [her] get naked and stuck some body parts into [her] on four occasions during an interstate trip. *Id.* Mr. Garretson threatened that if Avery told anyone, she would never be believed, no one would ever love her, Mrs. Garretson (who was like a grandmother to Avery) would hate her and never talk to her, and Avery would be kicked out of the only home she had ever known. *Id.* at 9. Avery was 10 at the time. *Id.* at 8.

---

[1] In the original pleadings, Avery is referred to as "Minor #1." To improve readability, the Court has written this opinion using pseudonyms for the victims instead of numbers.

1

After investigators were able to substantiate Avery's statements, they began investigating other children who had lived in the Garretsons' home. (Doc. 38, p. 9). Of the 35 children who lived with the Garretsons over a 20-year period, 18 said they had been repeatedly sexually assaulted by Mr. Garretson. (Doc. 52, p. 49). The indictment in this matter charged Mr. Garretson with 11 separate crimes against 8 victims. However, the Court will only recount the assaults to which Mr. Garretson ultimately pled guilty.

"Becca,"[2] who is intellectually disabled, was placed with the Garretsons at age 13. (Doc. 38, p. 11). Becca would frequently accompany Mr. Garretson on cross-country road trips, during which he would sexually assault her. *Id.* Becca recalls one trip during which Mr. Garretson parked at a California truck stop and then sexually assaulted her. After the assault concluded, Mr. Garretson told Becca to "clean up," then posed her with her legs up and took numerous Polaroid pictures of her naked body. *Id.*

"Caleb"[3] was placed with the Garretsons when he was 9 years old. (Doc. 38, p. 13). Starting when Caleb was 11 years old, he accompanied Mr. Garretson on long-distance truck trips. During these trips, Mr. Garretson would make Caleb perform oral sex on him. *Id.*

"Deirdre"[4] was placed with the Garretsons at age 12. (Doc. 38, p. 13). At age 13, she accompanied Mr. Garretson on a trip to California. *Id.* He sexually assaulted her twice during the trip, causing pain and days of bleeding. *Id.* at 13–14. When Deirdre successfully resisted a third assault by Mr. Garretson, he punished her by leaving her alone in the truck for over a day, then making her dig holes in the backyard when she returned home. *Id.*

---

[2] "Minor #2" in the original pleadings.
[3] "Minor #3" in the original pleadings.
[4] "Minor #5" in the original pleadings.

"Erin"[5] is a relative of the Garretsons. (Doc. 38, p. 15). Erin's parents were divorced and lived in different states, so Mr. Garretson transported Erin and her siblings between their parents' residences as a favor to her family. (Doc. 33, pp. 7–8). On one such trip, when Erin was 8 or 9 years old, Mr. Garretson made her share a bed with him and had her sleep nude or partially nude. *Id.* at 8. During the trip, Mr. Garretson touched Erin "all over her body" and digitally penetrated her. *Id.*; Doc. 38, p. 15. He warned her not to tell anyone about the assault. (Doc. 38, p. 15). When investigators asked if Mr. Garretson had taken photographs of her, Erin "became visibly shaken and upset" and said she could not talk about it. *Id.*

On October 25, 2016, Mr. Garretson appeared before this Court and pled guilty to five counts of interstate transportation of a minor with intent to engage in criminal sexual activity—one count each for the assaults of Avery, Becca, Caleb, Deirdre, and Erin. (Doc. 38, p. 7). His total offense level was calculated at 49, six points higher than the highest offense level on the guideline table. *Id.* at 28. The guidelines therefore recommended a sentence of life in prison.

Despite his guilty plea, it is unclear whether Mr. Garretson truly accepted responsibility for the offense. As part of Mr. Garretson's plea agreement, the government agreed not to prosecute Mrs. Garretson for concealing her husband's earnings to defraud the Social Security Administration. (Doc. 38, p. 29). In an interview with his probation officer, Mr. Garretson said that he was "physically incapable of doing the things they say [he] did" but had "signed the plea agreement to help [Mrs. Garretson] and [he would] do it again." *Id.* at 21 (first and third alterations in original). At his sentencing, he apologized "for anyone I've hurt" and "to any of the victims that I've hurt" but "most of all, to my wife, Lisa[.]" (Doc. 52, p. 46). Of Avery, he said: "it doesn't matter what she says or what she does, I'll always love that young lady regardless." *Id.*

---

[5] "Minor #8" in the original pleadings.

3

    *b. Procedural History*

    At sentencing, the Court heard from many of Mr. Garretson's victims about "the serious psychological devastation" Mr. Garretson's assaults had caused them. (Doc. 52, p. 47). The Court went on to describe Mr. Garretson's course of conduct as "the most prolific criminal conduct I've seen when it comes to child exploitation" and Mr. Garretson's individual offenses as "the most horrific, egregious offenses that I've seen in the cases I've handled before this Court." *Id.* at 48–49. Mindful of these facts as well as the need to protect the public, the Court imposed a life sentence. *Id.* at 49–50. The Court specifically stated that "[e]ven if there was any error in the Court's calculation of the Guidelines such that the guideline recommendation is less than life, the Court . . . will make the finding, given the serious and repeated nature of these offenses, an upward variance would be imposed to a sentence of life imprisonment[.]" *Id.* at 51.

    Mr. Garretson appealed from his sentence. (Doc. 48). The Eighth Circuit affirmed, holding that "a life sentence is not grossly disproportionate to the crimes, given the number of victims, the severity of the abuse, and the span of time over which the abuse occurred[.]" *United States v. Garretson*, 709 F. App'x 417, 418 (8th Cir. 2018). Mr. Garretson then filed a motion to vacate, claiming that his counsel had been ineffective. (Doc. 71). The Court denied this motion as well. (Doc. 83). Both this Court and the Eighth Circuit denied Mr. Garretson a certificate of appealability. (Doc. 95).

    In 2020, Mr. Garretson filed his first motion for compassionate release, claiming that his COPD, asthma, high cholesterol, and prediabetes put him at a serious risk of complications from COVID-19. (Doc. 99, p. 1). In denying the motion, the Court agreed that Mr. Garretson's illnesses constituted "extraordinary and compelling reasons" to modify his sentence, that he had behaved well during incarceration, and that he had participated in educational programming during that

4

time.  (Doc. 103, pp. 2–3).  Nevertheless, the Court found that the crime was a very serious one, that "four years on a life sentence" was not sufficient deterrence for Mr. Garretson's misconduct, and that a reduction in Mr. Garretson's sentence would not protect the public.  *Id.* at 3.  Mr. Garretson appealed the denial, which was summarily affirmed by the Eighth Circuit.  (Doc. 108-1).

Now before the Court is Mr. Garretson's second motion for compassionate release.

## II.     Facts Underlying the Present Motion

### a.  *Conduct While Incarcerated*

Mr. Garretson obtained his GED in prison in December 2019.  (Doc. 109-1, p. 19).  A former truck driver by trade, he has completed courses in CDL instruction at multiple levels.  (Doc. 109, 2, pp. 9–11).  He has also completed the "SoldierOn" program, two courses in basic mathematics concepts, two crochet courses, and a victim impact program.  (Doc. 109-2).  Mr. Garretson further represents that he has "maintained employment with excellent work reports," although it is unclear where he worked or whether he is currently working.  (Doc. 109, p. 4).

### b.  *New Medical Issues*

Mr. Garretson began serving his sentence at the United States Federal Prison in Tucson in 2016. (Doc. 114-2, p. 120).  A longtime heavy smoker, he suffered from COPD and asthma during his incarceration.  (Doc. 109-3, p. 7; Doc. 114-2, p. 121).  In early 2021, he contracted COVID-19, which eventually developed into pneumonia and caused acute respiratory failure requiring hospitalization.  (Doc. 109-3, p. 7).  Subsequently, he requested compassionate release from the Bureau of Prisons, claiming that he had received poor care with months-long delays in being seen.  (Doc. 109-3, p. 2).  The record does not contain a response to this request.

In 2023, Mr. Garretson had a stroke. (Doc. 109-3, p. 16). After "about a month and a half" in the hospital and rehab, Mr. Garretson was still largely immobile on his right side and had difficulty speaking. *Id.* He used a wheelchair or four-wheeled walker for mobility. *Id.* On March 26, 2024, he was transferred to the United States Medical Center for Federal Prisoners at Springfield for specialized therapy. (Doc. 114-2, p. 120).

Shortly before the Springfield transfer, Mr. Garretson was diagnosed with pneumonia on his right side. (Doc. 114-2, p. 120). A chest x-ray taken shortly before the transfer indicated that he was experiencing mild pleural effusion, or fluid buildup, in his right lung. *Id.* at 135. Another chest x-ray taken after the transfer revealed that the pleural effusion was now "moderate" instead of mild. *Id.* at 115. More concerningly, it revealed a "high suspicion for cancer." *Id.* at 104. Because the propriety and timeliness of Mr. Garretson's medical care is at issue in his motion for compassionate release, the Court will describe Mr. Garretson's subsequent course of treatment in detail.

This second x-ray was taken on April 8, 2024. (Doc. 114-2, p. 104). By April 10, analysis of the image was complete. *Id.* at 115. The next day, April 11, Mr. Garretson was debriefed on the results. *Id.* at 104. He agreed with his physician's recommendation for further imaging studies and testing. *Id.* A thoracentesis (draining of the excess lung fluid) was scheduled for two weeks later,[6] and the fluid would be tested to determine whether Mr. Garretson had cancer. *Id.* at 102. If no result could be obtained from the fluid, there would be a tissue biopsy on or before May 17. *Id.*

---

[6] As of April 11, Mr. Garretson was not coughing or short of breath, and the pain was treatable with ibuprofen. (Doc. 114-2, p. 104).

6

On April 17, roughly a week before the scheduled draining, Mr. Garretson told his unit nurse that he was short of breath. (Doc. 114-2, p. 98). The unit nurse ordered supplemental oxygen for him, which seemed to fix the problem. *Id.*; *id.* at 88. On April 18, Mr. Garretson's physical therapist noticed that his condition had deteriorated and called the prison clinic, which monitored Mr. Garretson's vital signs before deciding to transfer him to the emergency department that afternoon. *Id.* at 90, 93, 95. On the morning of April 19, the draining was carried out ahead of schedule, resulting in the successful removal of roughly 2 liters of fluid from Mr. Garretson's lungs. *Id.* at 77.

On April 20, Mr. Garretson returned from the emergency department, claiming to "feel 100% better." (Doc. 114-2, p. 71.) Additional x-rays, oxygen, and monitoring were ordered, and he was given his meals on the ward. *Id.* at 73–74. The x-rays were conducted on April 22 and confirmed that there was no rapid re-accumulation of fluid in Mr. Garretson's lungs. *Id.* at 64. On April 24, outside tests on the fluid removed from his lungs confirmed the presence of lung cancer. *Id.* at 57. A scan was scheduled, and medical staff formally requested approval for a telehealth consultation with an oncologist. *Id.*

On May 1, Mr. Garretson attended a telehealth follow-up appointment with a pulmonologist to discuss options for treating future fluid buildup in his lungs. (Doc. 114-2, pp. 277–78). The pulmonologist stated an intent to review the scan once it was completed and then forward it to the oncologist. *Id.* at 278.

The scan took place on May 7, 2024. (Doc. 114-2, p. 19). It revealed that Mr. Garretson's Stage 4 lung cancer had metastasized to his liver, adrenals, and many major bones. *Id.* at 13. The pulmonologist and oncologist were both informed of the results. *Id.* at 19. Plans were made for a bronchoscopy on an additional tumor "for tissue typing and treatment planning," a CT scan of Mr.

7

Garretson's head, an X-ray of Mr. Garretson's left femur and lumbar spine, and potential femur surgery and periodic lung draining. *Id.*

The head CT took place on May 10. (Doc. 114-2, p. 13). The biopsy was scheduled to be done by May 21 so that the results would be available by May 28, the date of Mr. Garretson's oncology appointment. *Id.* at 11. The CT revealed some changes in the left cerebrum, but no acute disease. *Id.* at 9. The bone x-rays showed no apparent softening of the bone. *Id.* The biopsy ultimately took place on May 28; it is unclear whether or when the oncology appointment was rescheduled. *Id.* at 1.

    c. *Current Physical Condition*

Due to Mr. Garretson's lung condition, he requires supplemental oxygen at all times. (Doc. 114-2, p. 5). His medical notes indicate that his lungs may require periodic draining if the fluid builds to the point where it affects his oxygen intake. *Id.* at 19. Around the time he filed the present motion, he perceived his lungs to be filling with fluid again. *Id.* at 4.

Mr. Garretson is presently confined to a self-propelled wheelchair. (Doc. 114-2, p. 6). However, his endurance is decreasing, and his physical therapist believes he may require a "pusher" in the future. *Id.* at 6.

In addition to the above-mentioned conditions, Mr. Garretson is missing all of his teeth. (Doc. 114-2, p. 120).

### III. Legal Standard

Motions for compassionate release are governed by 18 U.S.C. § 3582(c), which provides in relevant part that

> the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the

> defendant's facility, whichever is earlier, may reduce the term of imprisonment . . . , after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

The most "applicable policy statement[] issued by the Sentencing Commission" is U.S.S.G. § 1B1.13, which (among other things) sets forth a number of "Medical Circumstances of the Defendant" which may demonstrate "extraordinary and compelling reasons" to reduce a term of imprisonment. U.S.S.G. § 1B1.13(b). This includes cases where "[t]he defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end-of-life-trajectory)[,]" a category including "metastatic solid-tumor cancer[.]" *Id.* § 1B1.13(b)(1)(A). It also includes cases where the defendant is "suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." *Id.* § 1B1.13(b)(1)(B)(i).

Once a district court has determined that a defendant has demonstrated "extraordinary and compelling reasons" for compassionate release, it analyzes the statutory sentencing factors of 18 U.S.C. § 3553(a) to determine whether release should be granted. Besides accounting for "the nature and circumstances of the offense and the history and characteristics of the defendant[,]" a sentence must be crafted "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense", "to afford adequate deterrence to criminal conduct", "to protect the public from further crimes of the defendant", and "to provide the defendant with needed . . . medical care . . . in the most effective manner." 18 U.S.C. § 3553(a)(1)–(2). A sentence must be "sufficient, but not greater than necessary, to comply with [these four] purposes[.]" *Id.* at § 3553(a). Among other factors, courts also consider "the sentencing range established for" the offense. *Id.* at § 3553(a)(4).

9

## IV. Analysis

### a. Extraordinary and Compelling Reasons

Mr. Garretson argues that his medical conditions constitute "extraordinary and compelling reasons" for his release. The Court agrees. Mr. Garretson suffers from Stage 4 lung cancer which has metastasized, which qualifies as an "extraordinary and compelling reason" under U.S.S.G. § 1B1.13(b)(1)(A). Additionally, the fact that he is wheelchair-bound as a result of his stroke and respiratory difficulties may constitute a "serious physical or medical condition" inhibiting Mr. Garretson's ability to provide self-care in prison under § 1B1.13(b)(1)(B)(i). Therefore, the Court agrees that Mr. Garretson has demonstrated extraordinary and compelling reasons warranting release.

### b. 18 U.S.C. § 3553(a) Factors

Mr. Garretson claims that the 18 U.S.C. § 3553(a) sentencing factors would be fulfilled by a sentence of time served, possibly with a period of supervised release to follow. The Court disagrees.

First, the Court must consider the nature and circumstances of the original offenses. At the time of sentencing, they represented both the most extensive pattern of child exploitation and the most heinous offenses of any kind ever brought before the Court. Eight years later, they still do. The vulnerability of the victims—children with no stable homes of their own, entrusted to the Garretsons' care by the very authorities charged with protecting them—only makes Mr. Garretson's crimes more reprehensible. The psychological trauma he inflicted on his victims will follow them for the rest of their lives. And as the Court found during sentencing, the crimes to which Mr. Garretson pled guilty represent only a fraction of his assaults and less than one-third of his known victims.

Alongside these facts, the Court must weigh the history and characteristics of Mr. Garretson. There is no doubt that Mr. Garretson is gravely ill, that he suffers from a serious physical disability, that he has a loving and supportive family, and that he has taken steps to improve himself while incarcerated.

With this in mind, the Court considers whether a reduced sentence would be "sufficient, but not greater than necessary," to fulfill the four purposes of sentencing under § 3553(a)(2).

i. Seriousness of the Offense, Respect for the Law, Providing Just Punishment

In the Court's view, it is nearly impossible to overstate the seriousness of Mr. Garretson's crimes. It is similarly difficult to conceive how a seven-year sentence could provide just punishment for such an offense, or how news of a seven-year sentence for twenty years of heinous crimes would promote respect for the law.

Mr. Garretson protests that the original sentence of life "could and should be considered an unusually long sentence in this case." (Doc. 109, p. 2). To the contrary, life was the *guideline* sentence in this case. Indeed, life *would* have been the guideline sentence in this case even if Mr. Garretson's offense level was 6 points, or 13%, lower. And the Court specifically found that even if life was *not* the guideline sentence in this case, Mr. Garretson's crimes would have warranted an upward variance to a life sentence. The Eighth Circuit upheld that decision on appeal.

For these reasons, the first purpose of sentencing weighs heavily against releasing Mr. Garretson now.

ii. Adequate Deterrence to Criminal Conduct

On this point, Mr. Garretson argues that "the conviction in this case is a clear deterrent from committing crimes for not only Garretson but others as well." (Doc. 109, p. 12). However, the Court finds that the idea that a person could commit such crimes for twenty years and only

11

serve a seven-year sentence would likely not provide much deterrence to a person inclined to victimize children.

Mr. Garretson also argues that "studies show that for most individuals convicted of a crime, short to moderate prison sentences may be a deterrent but longer prison terms produce only a limited deterrent effect." (Doc. 109, p. 13). However, the Court finds that the sexual abuse of children is a sufficiently heinous crime that even the "limited deterrent effect" provided by a longer prison term is an important addition to whatever deterrent effect is produced by shorter sentences.

Therefore, this second purpose of sentencing weighs against releasing Mr. Garretson now.

iii. Protection of the Public

Mr. Garretson presents two arguments in support of his contention that he poses no danger to the public. First, he argues that "there is no concern that he would be a danger to the public if released. This is because he has learned to respect the rule of law, in conjunction with his rehabilitation." (Doc. 109, p. 4). Specifically, he points to his "extraordinary" record of rehabilitation and "submits that he is no longer the man who made irrational and irresponsible choices to engage in criminal conduct[.]" *Id.*

While Mr. Garretson is to be commended for his accomplishments in prison, the Court does not view them as evidence of a "dramatic character change" on his part. (Doc. 109, p. 19). This is, in part, because the Court would not describe Mr. Garretson's criminal conduct as a series of "irrational and irresponsible choices" so much as a continuous and calculated course of reprehensible conduct. During the decades in which he committed his crimes, Mr. Garretson was a respected member of his community with a steady job, a solid marriage, and no criminal history to speak of. His responsible behavior while incarcerated is not a surprise in view of his day-to-day life before his arrest, and it is therefore not inconsistent with his previously known character.

12

Mr. Garretson's better argument is that he poses less of a risk to the public than he did when first incarcerated. He is currently wheelchair-bound, seriously ill, and has trouble breathing, all of which would make it difficult for him to force himself on a future victim. But the Court must also consider that Mr. Garretson did not commit his crimes using brute force alone. Instead, he was able to use his authority in the household and influence as a father figure to gain his victims' compliance.

The Court concludes that the public at large is not in danger from Mr. Garretson. However, Mr. Garretson appears to have drawn most of his victims not from the public at large, but rather from under his own roof. Home confinement could still allow Mr. Garretson access to young people. Many of his friends and family believe him factually innocent, and therefore might conceivably flout the conditions of Mr. Garretson's release and bring their children to visit him. *See* Doc. 109-1. While steps might be taken to prevent this if Mr. Garretson was confined to his home, such steps would tax the resources of the United States Probation Office. And because Mr. Garretson would frequently need to leave home to attend medical appointments, it likely would not be possible to adequately surveil Mr. Garretson's access to young people at all times.

Accordingly, the Court finds that this third purpose of sentencing weighs somewhat against Mr. Garretson's early release.

### iv. Effective Provision of Medical Care

Finally, and perhaps principally, Mr. Garretson argues that he will be able to obtain better medical care if he returns home. He points to shortcomings in his COVID-19 and stroke treatment and claims that going home will allow him to obtain timely, quality care from providers of his choosing.

The major problem with this argument is that all of the *specific* shortcomings in care Mr. Garretson has identified took place at the Tucson facility. Mr. Garretson is now housed at Springfield, a specialized medical prison. The Court has carefully reviewed Mr. Garretson's medical records and finds that his course of treatment at Springfield has been appropriate, reasonably prompt, and largely commensurate with the course and pace of treatment that would be available upon his release. Indeed, some services at Springfield (the onsite clinic, expedited cross-communication between his various treatment providers, and the ability to promptly be seen by a nurse at night) would not be available to Mr. Garretson if he was released to his home.

Mr. Garretson also mentions that he is concerned about catching COVID-19 again. However, Mr. Garretson's COVID-19 concerns were raised in his first (2020) motion for compassionate release, and the Court found that they did not outweigh the seriousness of the crime so as to entitle Mr. Garretson to early release. (Doc. 103, pp. 2–3). Since then, the pandemic has slowed down markedly, vaccines have become widely available, Mr. Garretson has contracted and survived COVID-19 (thereby potentially gaining natural immunity), and Mr. Garretson has moved to a specialized medical facility in an excellent position to take precautions against the virus. If COVID-19 was not a sufficient risk to Mr. Garretson to warrant early release in 2020, near the height of the pandemic, it certainly should not be now.

For these reasons, the Court concludes that the need to provide medical treatment to Mr. Garretson is a neutral consideration.

Because none of the § 3553(a) factors weighs in favor of modifying Mr. Garretson's sentence, the Court finds no basis to depart from its original sentence of life in prison.

V.   **Conclusion**

As stated, the Court has no doubt that Mr. Garretson is seriously ill and likely dying. The

Court does not lightly deny relief under these circumstances. But even considering Mr. Garretson's condition, the nature and circumstances of his crimes continue to warrant the sentence the Court originally imposed: life in prison.

IT IS THEREFORE ORDERED that Defendant's motion (Doc. 109) is DENIED.

IT IS SO ORDERED this 29th day of July, 2024.

/s/ P. K. Holmes, III
P.K. HOLMES, III
U.S. DISTRICT JUDGE